George Tilzer, J.
The petitioner landlord brings this article 78 proceeding to review a series of orders issued by the State Rent Administrator on February 19, 1957, under various sections of the State Rent and Eviction Regulations.
*122 Petitioner is the owner and landlord of a group of garden-type apartment buildings operated as a single unit at Rego Park, Queens, containing 389 apartments.
On June 2, 1955, petitioner made application under subdivision 5 of section 33 of the State Rent and Eviction Regulations for an increase in maximum rent to yield a 6% return on the value of the property. While that proceeding was pending, related problems arose. The first of these stemmed from the tenants’ complaint that, among other things, the landlord had eliminated a roof garden which had always been a significant feature used by the landlord to attract tenants. The tenants complained that the elimination of the service invalidated the landlord’s certification that he was maintaining essential services and that the certification was a statutory prerequisite to the grant of a 6% net return application.
The landlord’s answer, in brief, was that the continued main- ■ tenance of the roof gardens or sun decks was illegal because violations had already been posted against the properties by the department of housing and buildings.
On May 15, 1956, almost a year after the proceeding was initiated, orders were issued increasing the maximum rents, effective that day, but simultaneously therewith orders were issued reducing the maximum rent of each unit, based on the Administrator’s determination that the elimination of the roof gardens constituted the elimination of an essential service and warranted a reduction in the maximum rent of $1 per apartment, or $4,800 per annum for the premises.
We agree with the Administrator’s ruling that if the tenants had been deprived of an essential service so far as the roof gardens were concerned, proper procedure required that the 6% return increase be ordered first and from that level there be deducted that sum determined to reflect the decrease in service. Only in this way would the tenants have the benefit of the decrease. In a subsequent application for a 6% return (which the landlord has already instituted), this rent reduction would probably be restored.
We find, nevertheless, that the Administrator’s determination that the roof gardens were an essential service is contrary to fact, contrary to the Administrator’s prior finding as to this very property, and contrary to the Administrator’s Opinion No. 98. Assuming that the roof gardens were in the nature of a service rather than a facility, the Administrator’s own criteria for determining whether or not a service is an essential service (Op. No. 98) compels the conclusion that the roof gardens were pot m ‘ ‘ essential service. ’ ’ The gardens or sun decks *123 were provided with the property when the buildings were first constructed in 1940 and 1941. No doubt, at that time, they were a well-advertised feature aimed at prospective tenants. It is unquestioned, however, that in May, 1953, prior to the petitioner’s purchase of the premises, a tenant sought a reduction in rent because of a decrease in services, including the roof garden. The application was denied. Upon protest the Administrator upheld the local office, noting that the services which were removed, including the roof garden, were removed as far back as 1945. Adverting to his Opinion No. 98, wherein it is stated that “ experience has shown that where tenants are deprived of a service they deem essential, they do not usually suffer this deprivation without challenge ”, the Administrator concluded that there had been no decrease in essential services warranting a decrease in the maximum rents. Upon appeal by the tenant, the petition was dismissed by Mr. Justice Ritchie (Matter of Karlin v. McGoldrick, N. Y. L. J., Dec. 8, 1954, p 13, col. 6).
"While the present Administrator urges that the roof gardens were used by the tenants, he nevertheless concedes that they were “maintained in a continuing deteriorated condition.” Difficult as it is to understand this language as indicative of the status of these facilities, the tenants’ failure to express dissatisfaction with this “ continuing deteriorated condition ” suggests that they do not consider the roof gardens an essential service (Op. No. 98).
Moreover, it was not the fact that the roof gardens were not maintained which led to the filing of violations against them. The notices of violation denominated the roof garden structures themselves illegal. The illegality of the structures, previously discontinued as a facility by the landlord, cannot give rise to a rent reduction in favor of the tenants. The orders of reduction in the circumstances are arbitrary, capricious and unreasonable.
The second problem posed by the present proceeding arises from the fact that the landlord, during the pendency of the primary 6% return proceeding, entered into two-year leases affecting five apartments (State Residential Rent Law, § 4, subd. 4 [a], par. [4]; State Rent and Eviction Regulations, § 33, subd. 2). The landlord learned during one of the hearings, but before the final order was issued, that the commission’s auditors had established the new maximum rent for each apartment. It thereupon, in anticipation of such rent increases, executed leases with five tenants which provided for 15% increases imposed not on the then existing ceiling rents (before *124 the 6% return increase), but, rather, superimposed on the anticipated higher rental which was not yet in effect.
The court agrees that the Administrator’s ruling in this particular that these leases, whether the arrangement was consummated by one or two lease arrangements and regardless of the fact that the landlord did not sign until after the anticipated increase had been granted, cannot be approved. Subdivision 2 of section 33 provides that a landlord is entitled to a 15% increase above the maximum rent then in effect.
It is no answer for the landlord to say that the lease was not executed until it had been signed by the landlord. The landlord’s purpose in having the tenant sign the lease when he did, was to obtain from him an irrevocable commitment to an agreement which under the law could not validly have been executed at that time. To accept the landlord’s version would be to countenance a device to circumvent the rent control statute.
The conclusion does not follow, however, as drawn by the Administrator, that these five tenancies are to be considered lease tenancies for two-year terms. The reduction of the lease rents to 115% over the pre-6% return order thwarts the intentions of the parties rather than carries them out. The lease, being in violation of the statute, falls in its entirety. The ruling of the Administrator, insofar as it upholds the leases at the reduced rents for two-year terms, is unwarranted by the record and contrary to law. The tenants are to remain in possession as statutory tenants under the maximum rents fixed in the hardship proceeding.
The last problem, admittedly a minor one, concerns petitioner’s claim that the Administrator erred in calculating managing commissions with regard to this owner-managed property. The premises consist of five garden-type adjacent apartment buildings. The Administrator does not dispute that its policy with respect to management fees has changed more than once. It appears, however, that the standards and formulas adopted by the commission with respect to owner-managed property were dictated as experience indicated the need for change. The formula presently used followed a study of actual management rates proven by landlords in the many hundreds of eases which the Administrator had processed during the lifetime of the statute. Of the first $50,000 of gross rents an allowance of 5% for commissions is made; on the next $50,000 the allowance is 4%; on the next $100,000 the allowance is 3% and on the next $300,000 the allowance is 2%. An examination of the commission’s work sheets discloses that commissions in the total amount of $11,073.93 were allowed in accordance with this for *125 muía, the rent roll of approximately $380,000 from the five properties being considered as a single unit of rent collections.
The petitioner landlord would apply the foregoing percentages to the rent roll of each building. The advantage to the petitioner is obvious. It may not, however, treat the property as a single unit or as separate entities depending upon whether it is to its benefit to do so. The application was submitted by the landlord upon the fundamental basis that the five separate buildings constituted a single property. The buildings were sold to the landlord as a unit. They are operated and managed as a single unit. There is one set of employees who service the five buildings, there is a common park for the tenants of these buildings, there is a master meter for. the five buildings, and there is one office for service of the five buildings. In the circumstances the Administrator properly ruled that these five properties constituted a single unit of rent collections.
The matter is remanded to the respondent Administrator with a direction to afford relief to the petitioner as follows:
The order decreeing the roof gardens to be an essential service is annulled and the $1 decrease in rents is to be restored.
The orders involving the tenants Maran, Francis, Fried, Pittsburgh and Murphy are modified so as to provide that these tenants shall remain in possession as statutory tenants under the maximum rents fixed in the hardship proceeding.
Settle order.